## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| WILLIAM A. HENAHAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 7:16-CV-00042 _____ |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

COMES NOW the plaintiff, William A. Henahan, by counsel, and files his Complaint against the United States of America based upon the following:

### JURISDICTION AND VENUE

1.     Mr. Henahan is a resident of Catawba, Virginia.

2.     Mr. Henahan served in the United States Marine Corp from May 20, 1966, to May 19, 1968.

3.     Mr. Henahan is a veteran of the Vietnam War.

4.     In 1968, Mr. Henahan was honorably discharged from the military.

5.     Mr. Henahan timely and fully complied with the requirements of the Federal Tort Claims Act (28 U.S.C. § 2671, *et seq.*) (the "FTCA"), including, but not limited to, presenting an administrative claim in writing to the United States Department of Veterans Affairs within two years after his claim accrued, and the United States Department of Veterans Affairs has failed to timely resolve his claim.

6.     The relevant acts and omissions occurred at the Veterans Affairs Medical Center in Salem, Virginia ("Salem VAMC"), and the Veterans Affairs Medical Center in Durham, North Carolina ("Durham VAMC"), both of which are owned and operated by the Defendant.

7.     At all times and places pertinent hereto, the defendant employed all of the healthcare providers at the Salem VAMC and the Durham VAMC, including without limitation Dr. Chin Ti-Lin, Dr. Stephen Freedland, and Dr. Erin McNamara.

8.     At all times and places pertinent hereto, the defendant was acting through its agents, employees, servants, workmen, partners, and joint venturers.

9.     At all times and places pertinent hereto, the defendant's agents, employees, servants, workmen, partners, and joint venturers were acting within the course and scope of their employment, agency, servancy, partnership, and/or joint venture with the defendant.

10.     The defendant is liable to the plaintiff for the acts and omissions of its employees, agents, servants, partners, and joint venturers pursuant to applicable doctrines of respondeat superior, corporate liability, agency, partnership, or other applicable doctrine.

11.     Jurisdiction is conferred on this Court by 28 U.S.C. § 1346(b).

12.     Venue is proper pursuant to 28 U.S.C. § 1402(b).

13.     Plaintiff certifies compliance with Va. Code § 8.01-20.1 as to each and every defendant named herein.

14.     Plaintiff affirmatively asserts that the defendants are not entitled to application of North Carolina law in any aspect of this case.

15.     Should the court find that North Carolina law applies to any aspect of this case, Plaintiff objects to the pre-filing requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure. Rule 9(j) effectively requires plaintiffs to prove their case before factual discovery is

2

even begun, denies medical malpractice plaintiffs their rights of due process of law and equal protection under the law, the right to open courts, and the right to a jury trial, violates the separation of powers, and confers an exclusive emolument on health care providers, in violation of the United States and North Carolina constitutions. Rule 9(j) violates the Seventh and Fourteenth Amendments of the United States Constitution, and Article I, sections 6, 18, 19, 25 and 32 and Article IV, sections 1 and 13 of the North Carolina Constitution. Without waiving these objections, Plaintiff has complied with the requirements of Rule 9(j) by, among other things, the medical care and all medical records pertaining to the alleged negligence that are available to the Plaintiff after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care. If the Court later determines that Plaintiff's 9(j) expert does not meet the requirements of Rule 702, Plaintiff will seek to have that person qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence, and Plaintiff hereby moves the Court, pursuant to Rule 9(j)(2), to so qualify that person.

16.     Should the court find that North Carolina law applies to any aspect of this case, Plaintiff objects to Rule 414 of the North Carolina Rules of Evidence and the 2011 amendments to N.C. Gen. Stat. § 8-58.1 (Sections 1.1 and 1.2 of Session Law 2011-283 (House Bill 542)) as unconstitutional. These new legislative enactments, which apply to actions arising on or after October 1, 2011, violate Article IV, § 13(2) of the North Carolina Constitution, which provides that "No rule of procedure or practice shall abridge substantive rights or abrogate or limit the right of trial by jury." Sections 1.1 and 1.2 of House Bill 542 also violate the right to a jury trial, due process of law, equal protection under the law, and the right to open courts, and violate the

26340/1/7012453v6

separation of powers, in violation of Article I, sections 6, 18, 19, and 25, and Article IV, sections 1 and 13 of the North Carolina Constitution. Plaintiff in this action has incurred substantial medical expenses as a result of Defendant's negligence. Under the law, Plaintiff is entitled to recover his "medical expenses," including "all medical bills reasonably incurred by the plaintiff as a proximate result of the negligence of the defendant." N.C.P.I. Civil 810.04. Contrary to North Carolina substantive law, and in violation of the North Carolina Constitution, Sections 1.1 and 1.2 of House Bill 542 bars Plaintiff from submitting evidence of Plaintiff's medical bills to the decision maker, and limits the Plaintiff to presenting "the amounts actually paid to satisfy the bills" and "the amounts actually necessary to satisfy the bills that have been incurred but not yet satisfied." These new evidentiary and procedural rules, if applied in this case, will directly harm Plaintiff.

17. Should the court find that North Carolina law applies to any aspect of this case, Plaintiff objects to N.C. Gen. Stat. § 90-21.19 ("the cap on noneconomic damages") as unconstitutional. The cap on noneconomic damages potentially denies medical malpractice plaintiffs, including Plaintiff in this action, the right to a jury trial, due process of law, equal protection under the law, and the right to open courts, violates the separation of powers, and confers an exclusive emolument on health care providers, in violation of the United States and North Carolina constitutions. The cap on noneconomic damages violates the Seventh and Fourteenth Amendments of the United States Constitution and Article I, sections 6, 18, 19, 25 and 32 and Article IV, sections 1 and 13 of the North Carolina Constitution.

## FACTS

18. On or about July 26, 2011, Mr. Henahan obtained an elevated PSA test (4.86) at the Salem VAMC.

4

19.     On or about July 29, 2011, a prostate biopsy confirmed prostate cancer Gleason grade 6-9.

20.     In August 2011, Mr. Henahan was diagnosed with adenocarcinoma of the prostate.

21.     Mr. Henahan had a PSA test again in October 2011.

22.     The October 2011 PSA results were also abnormal.

23.     Chin-Ti Lin, M.D., Mr. Henahan's urologist at the Salem VAMC, was aware that Mr. Henahan's PSA was trending markedly and rapidly upward.

24.     Mr. Henahan was never offered medical therapy for his adenocarcinoma.

25.     Mr. Henahan was never offered radiohormonal therapy.

26.     Mr. Henahan was also never offered alternative therapies for his adenocarcinomoa such as cryotherapy. In fact, Mr. Henahan was informed at the Salem VAMC that surgery was his only option.

27.     Mr. Henahan was only offered a radical prostatectomy at the Durham VAMC.

28.     Mr. Henahan's Salem VAMC physicians failed to provide any treatment for Mr. Henahan's prostate cancer from the time of diagnosis in August 2011 to February 15, 2012.

29.     Mr. Henahan's Salem VAMC physicians failed to consider Mr. Henahan's significant medical history including diabetes mellitus type II with neuropathy, hypertension, respiratory distress, hepatitis C, kidney disease, anxiety disordered, posttraumatic stress disorder, and mood disorder, all of which mitigated against a significant surgery.

30.     Mr. Henahan's Salem VAMC physicians also failed to consider Mr. Henahan's significantly elevated PSA prior to sending him to Durham for surgery.

5

31.     Mr. Henahan's Salem VAMC physicians improperly preferred surgery for Mr. Henahan, steered him in that direction, and told him that other options were not available and/or were not possible when, in fact, other options were the preferred first-line treatment modalities for Mr. Henahan.

32.     Though Mr. Henahan was not an appropriate candidate for surgery, his Salem VAMC physicians intentionally steered him to the Durham VAMC because Dr. Freedland, a surgeon at Durham VAMC, was undertaking a clinical study on radical prostatectomy at the time and the Salem VAMC wished to participate in and/or further experimentation on Mr. Henahan as part of said study.

33.     On February 8, 2012, an MRI revealed no evidence of extracapsular extension of the disease and no significant lymphadenopathy.  Nonetheless, the VAMC providers continued to recommend and refer Mr. Henahan for surgery.

34.     Dr. Freedland evaluated Mr. Henahan and knew, or should have known, that he was not an appropriate candidate for surgery.  Nonetheless, Dr. Freedland advocated that Mr. Henahan proceed with a radical prostatectomy.

35.     On February 15, 2012, Dr. Freedland and Dr. McNamara, a resident surgeon, performed a radical retropubic prostatectomy with extended bilateral pelvic lymphadenectomy on Mr. Henahan, to treat his prostate cancer.

36.     During the surgery, Dr. McNamara and Dr. Freedland placed a surgical clip across Mr. Henahan's right ureter, which eventually caused an obstruction, infections, and associated illnesses.

37.     During the surgery, Mr. Henahan experienced extensive blood loss, but no effort was made to identify injury to his right ureter.

6

38. On February 16, 2012, Mr. Henahan became profoundly hypoxic with fluid overload, liver dysfunction, renal failure, cardiopulmonary insufficiency and a distended abdomen.

39. He required a blood transfusion.

40. His urine output was approximately 335 ccs, roughly 10% of normal urine output, which was highly suggestive of a urine leak and intraoperative injury.

41. Nonetheless, no one diagnosed or even suspected that Mr. Henahan had suffered an intraoperative ureter injury.

42. On February 17, 2012, Mr. Henahan developed oliguria, likely due to renal insufficiency and complicated by liver damage, and his serum creatinine increased from 0.9 to 1.7, all of which reflected impaired kidney function.

43. Mr. Henahan's urine output fell to 70 ccs.

44. Still, no one suspected a ureter injury.

45. On February 18, 2012, Mr. Henahan's drain creatinine content was 2.9 and his serum creatinine was 1.9.

46. On February 19, 2012, Mr. Henahan's drain output was over 600 ccs.

47. Despite this, no one suspected a ureter injury.

48. On February 20, 2012, Mr. Henahan's serum creatinine continued to rise and he was in critical condition.

49. Mr. Henahan suffered from hepatic encephalopathy with serum ammonia of 44 umol/L.

50. A renal ultrasound of Mr. Henahan revealed hydronephrosis. Still, no one suspected a ureter injury.

7

51. On February 22, 2012, Mr. Henahan's providers removed his Jackson-Pratt Drain and placed a stitch "to reduce drainage from prior drain site."

52. Mr. Henahan was discharged home.

53. Mr. Henahan continued to suffer from significant abdominal pain.

54. On April 2, 2012, Mr. Henahan reported that he was suffering swelling of his feet, a symptom of retroperitoneal fluid collection consistent with a urinoma.

55. On April 17, 2012, Mr. Henahan underwent a CT scan of the abdomen which revealed a large lymphocele consistent with a urinoma.

56. On April 23, 2012, Mr. Henahan was re-admitted to Durham VAMC for a retroperitoneal urine leak.

57. On April 23, 2012, Mr. Henahan underwent CT-guided drainage of the lymphocele.

58. On April 27, 2012, a CT urogram revealed right ureteral injury and urine leak.

59. On May 2, 2012, Mr. Henahan underwent percutaneous nephrostomy tube placement.

60. On May 4, 2012, Mr. Henahan was discharged.

61. Over the next several weeks, Mr. Henahan's percutaneous nephrostomy tube output increased and his Jackson-Pratt drainage decreased.

62. On June 12, 2012, an antegrade urogram disclosed that the right distal ureter was obstructed at the level of a surgical clip at the level S1-S2.

63. On July 23, 2012, Mr. Henahan underwent a right ureteral reconstruction with ileal ureter, cystoscopy with dilation of the bladder neck contracture, and appendectomy.

8

64.     It was necessary to remove Mr. Henahan's appendix to allow access to harvest ilium for reconstruction of the ureter.

65.     Mr. Henahan remained hospitalized postoperatively for the next week.

66.     He suffered from post-operative pain, confusion, and associated illness throughout his hospitalization.

67.     After discharge, Mr. Henahan required multiple visits to the emergency department due to catheter difficulties and infections.

68.     On August 7, 2012, Mr. Henahan was diagnosed with vancomycin-resistant enterococci ("VRE").

69.     Mr. Henahan continued to have urinary incontinence and required the use of adult diapers.

70.     On August 9, 2012, a post-operative cystoscopy was read as normal and plans were made for removal of the Foley catheter and ureteral stent.

71.     On August 21, 2012, a Lasix renal scan was ordered when Mr. Henahan presented hypotensive and with a blood sugar of 17.

72.     Mr. Henahan was admitted to the hospital through the emergency department with a small incisional infection and urinary tract infection.

73.     Mr. Henahan suffered from a bladder neck closure and a Foley catheter was placed.

74.     He remained hospitalized until August 24, 2012.

75.     On September 14, 2012, Mr. Henahan was evaluated at the Urology Clinic at the Durham VAMC.

9

76.    Mr. Henahan's percutaneous nephrostomy tube was removed but he remained catheterized.

77.    Mr. Henahan was instructed to begin a self-catheterization regime.

78.    On October 2, 2012, the Urology Clinic at the Durham VAMC noted that Mr. Henahan continued to suffer urinary incontinence following his right ureteral injury repair with small bowel segment and several ureteral strictures with apparent anastomotic stricture.

79.    On October 2, 2012, Mr. Henahan continued to pass mucus.

80.    On October 9, 2012, it was noted that Mr. Henahan was suffering a bladder neck contracture and could not catheterize himself.

81.    A cystoscopy was performed and revealed bladder neck closure.

82.    He was noted to have a "very dense and hard" contracture.

83.    Mr. Henahan was scheduled for another surgery.

84.    On October 29, 2012, Mr. Henahan underwent a transurethral resection of the bladder neck. It was noted that Mr. Henahan "may require a second stage procedure with more significant resection."

85.    Mr. Henahan continues to be catheter dependent and suffers from passage of mucus related to the ilial ureter operation.

86.    Mr. Henahan continues to suffer pain, infection, incontinence, mental distress, and associated illnesses, as a result of the negligence of the Salem VAMC physicians and the Durham VAMC physicians.

87.    Mr. Henahan continues to suffer from injuries that are permanent and will require medical treatment indefinitely in the future, as a result of the negligence of the Salem VAMC physicians and the Durham VAMC physicians.

10

## COUNT I
### (Medical Malpractice)

88.    Each of the foregoing paragraphs are incorporated herein by reference.

89.    Mr. Henahan and the Defendant had a patient-health care provider relationship.

90.    The Defendant and its agents, employees, servants, workmen, partners, and joint venturers owed Mr. Henahan a duty to act as reasonably prudent health care providers in the same or similar specialties would have acted in the same or similar circumstances.

91.    The defendant was negligent and committed medical malpractice in the following respects:

      a.    They did not properly intervene in Mr. Henahan's condition.

      b.    They did not timely intervene in Mr. Henahan's condition.

      c.    They did not properly treat Mr. Henahan's condition.

      d.    They did not timely treat Mr. Henahan's condition.

      e.    They did not properly appreciate Mr. Henahan's condition.

      f.    They did not timely appreciate Mr. Henahan's condition.

      g.    They did not properly appreciate Mr. Henahan's anatomy.

      h.    They did not timely appreciate Mr. Henahan's anatomy.

      i.    They did not properly interpret Mr. Henahan's laboratory studies.

      j.    They did not timely interpret Mr. Henahan's laboratory studies.

      k.    They did not timely communicate with one another.

      l.    They did not timely communicate with other healthcare providers.

11

m. They caused avoidable iatrogenic surgical injury to Mr. Henahan.

n. They failed to utilize appropriate surgical technique.

o. They performed surgery on Mr. Henahan when he was not an appropriate surgical candidate.

p. They failed to offer Mr. Henahan treatment options other than surgery.

q. They incorrectly and improperly informed Mr. Henahan that other treatment options were not possible.

r. They did not timely work up Mr. Henahan's condition.

s. They did not properly work up Mr. Henahan's condition.

t. They failed to refer Mr. Henahan for treatment outside of the VAMC system.

u. They failed to timely identify ureter injury.

v. The failed to properly identify ureter injury.

w. They failed to timely investigate Mr. Henahan's intraoperative blood loss.

x. They failed to timely repair Mr. Henahan's transected right ureter.

y. They provided substandard care and treatment to Mr. Henahan when they knew, or should have known, that such substandard care and treatment would cause, or would likely cause, serious injury and/or the death of Mr. Henahan.

z. If additional evidence is adduced during the course of discovery or trial showing that the defendants and/or their employees, agents, or servants were negligent in other ways, Plaintiff reserves the right to amend, alter, or expand the allegations set forth herein up to and during trial.

92.     As a direct and proximate result of the negligence of the Defendant and its employees, agents, servants, workmen, partners, and joint venturers, Mr. Henahan has suffered, is suffering, and will continue to suffer in the future serious and permanent injuries including,

12

but not limited to, permanent incontinence, loss of sensation and function, renal insufficiency and/or loss of renal function, substantial mental anguish, physical pain, inconvenience, embarrassment, disfigurement and deformity, humiliation, loss of enjoyment of life, decreased independence, depression, anxiety, stress, decreased self-esteem and loss of earning capacity.

93.     If the Defendant had complied with the applicable standard of care, Mr. Henahan would have avoided his injuries, damages and outcome.

94.     Mr. Henahan seeks to be fairly compensated for his injuries and damages to the fullest extent permitted under the law.

WHEREFORE, William A. Henahan, by counsel, requests judgment against the Defendant in the amount of $2,000,000.00, plus his taxable costs with pre-judgment and post-judgment interest.

WILLIAM A. HENAHAN

By: _____
                              By Counsel

S. D. Roberts Moore (VSB No. 3456)
Charles H. Smith, III (VSB No. 32891)
Les S. Bowers (VSB No. 77840; NC Bar No. 38039)
GENTRY LOCKE
10 Franklin Road, S.E., Suite 900
P. O. Box 40013
Roanoke, VA  24022-0013
Phone: (540) 983-9300
Fax:  (540) 983-9400
Email:  moore@gentrylocke.com
        smith@gentrylocke.com
        bowers@gentrylocke.com

*Counsel for Plaintiff*

13